IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 22-cr-00059-DKW<br>Case No. 24-cv-00189-DKW-KJM |
| Plaintiff, | |
| vs. | **ORDER (1) DENYING MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY; (2) DENYING EVIDENTIARY HEARING; AND (3) DENYING CERTIFICATE OF APPEALABILITY** |
| CYRUS CROSKERY, | |
| Defendant. | |

Petitioner Cyrus Croskery, proceeding *pro se*, moves pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence for conspiracy to distribute and to possess with the intent to distribute methamphetamine and fentanyl, and for possession of a firearm in furtherance of a drug trafficking crime. Dkt. No. 94. Croskery contends that his attorney—Cassandra Stamm—provided ineffective assistance of counsel in various ways throughout his change of plea, sentencing, and appeal processes. There is no evidence, however, that Stamm's performance was constitutionally deficient or that any prejudice resulted from Croskery's allegations of the same. Consequently, as discussed more fully below, Section 2255 relief is DENIED. In addition, because reasonable jurists would not debate the denial of Croskery's motion, a certificate of appealability is likewise DENIED.

## FACTUAL & PROCEDURAL BACKGROUND

### I. Charges

On February 3, 2022, Croskery was charged via criminal Complaint with three counts: (1) possession with the intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A); (2) possession of a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c); and (3) felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).  Dkt. No. 1.  Initially, Salina Kanai, the Federal Public Defender, represented Croskery.  Dkt. No. 5.  On June 23, 2022, however, Kanai moved to withdraw.  Dkt. No. 14.  The Magistrate Judge granted the motion on June 30, 2022, and appointed Walter Rodby—an attorney from the Criminal Justice Act ("CJA") Panel—as substitute counsel.  Dkt. No. 19.

Less than a month later, on July 21, 2022, a Grand Jury returned an Indictment against Croskery, charging him with eight counts, including: (1) one count of conspiracy to distribute and to possess with the intent to distribute methamphetamine and fentanyl, in violation of 21 U.S.C. § 846 (Count 1); (2) two counts of possession with the intent to distribute 50 grams or more of methamphetamine and fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and (b)(1)(B) (Counts 2 and 3); (3) one count of discharging a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(iii)

(Count 4); (4) one count of possession of a firearm in furtherance of a drug

trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 5); and (5)

three counts of being a felon-in-possession of ammunition or a firearm, in violation

of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Counts 6–8).  Dkt. No. 20.  Croskery

pled not guilty to each of these charges on July 29, 2022.  Dkt. No. 25.

## II.    <u>Motion to Suppress</u>

On August 8, 2022, Croskery moved to suppress certain statements he made

to DEA agents, arguing, *inter alia*, that law enforcement coerced him into waiving

his *Miranda* rights by promising leniency.  Dkt. No. 26 at 10–12.  Following an

evidentiary hearing, *see* Dkt. No. 51, the Court denied the motion, noting that

"[DEA Special Agent] Gray credibly testified that he made no promise of leniency

in exchange for Croskery's compliance during the interrogation;" rather, "the

evidence shows that Croskery's waiver was willful, voluntary and not the product

of coercion or other improper influence."  Dkt. No. 54 at 11–12.

On April 10, 2023, Rodby moved to withdraw.  Dkt. No 64.  The Court

granted the motion and substituted another CJA attorney—Cassandra Stamm—as

counsel for Croskery.  Dkt. Nos. 67 & 68.  Shortly thereafter, Stamm entered into

plea negotiations with the Government on Croskery's behalf.  *See* Decl. of

Cassandra Stamm at ¶¶ 8, 10, Dkt. No. 103-3.  Although Croskery had initially

hoped to obtain a Rule 11(c)(1)(C) plea agreement which would bind the Court—if

accepted—to imposing a sentence of fifteen years, the Government would not agree. *See id.* at ¶¶ 10–11; Dkt. No. 103-3 at 41. Croskery therefore agreed to instead accept a plea agreement in which he would plead guilty to Counts 1 and 5 of the Indictment, thereby allowing him to argue for the fifteen-year mandatory minimum,[1] but leaving open the possibility that the Court could impose a higher sentence, up to and including life. *See* Memorandum of Plea Agreement ("MOPA") at ¶¶ 4, 7, Dkt. No. 79; Dkt. No. 103-3 at 48.

## III.    <u>Guilty Plea</u>

On July 27, 2023, Croskery appeared before the Court to change his plea pursuant to the plea agreement negotiated with the Government. Dkt. No. 78. Following a detailed colloquy that included his satisfaction with Stamm's representation, his opportunity to review and discuss the charges and the plea agreement, the nature, voluntariness, and substance of his plea, and the possible sentencing and appellate consequences of the same, Croskery entered a plea of guilty to Counts 1 and 5 of the Indictment. *See generally* Tr. of Change of Plea ("COP") Hrg., Dkt. No. 101. The Court accepted his plea, finding it to be

---

[1]Had Croskery been convicted of all counts at trial, the mandatory minimum could have been as high as 25 years—10 years for a drug offense involving more than 50 grams of methamphetamine, 5 years for possession of a firearm in furtherance of a drug trafficking crime, and 10 years for discharging a firearm during and in relation to a drug trafficking crime. *See* Dkt. No. 103-3 at 41–42, 48.

knowing, informed, and voluntary and adjudged Croskery guilty, as charged.  *See id.* at 31:6–32:6.

## IV.    <u>Sentencing</u>

On October 2, 2023, the United States Probation Office ("USPO") issued a draft Presentence Investigation Report ("PSR").  *See* Draft PSR, Dkt. No. 80. Therein, Croskery was held responsible for a total converted drug weight of 87,902 kilograms,[2] resulting in a base offense level of 36.  *Id.* at ¶¶ 40–41.  The draft PSR then added enhancements totaling eight levels, including two levels pursuant to USSG § 2D1.1(b)(2) for the use of violence and a credible threat to use violence during the commission of the offense,[3] four levels under USSG § 2D1.1(b)(13) for knowingly misrepresenting fentanyl as oxycodone, and two levels pursuant to USSG § 3B1.1(c) for being an organizer, leader, manager, or supervisor of the criminal activity.  *Id.* at ¶¶ 43–44, 46.  After subtracting three levels for timely acceptance of responsibility under USSG § 3E1.1(a) & (b), Croskery's total offense level was determined to be 41, which, when coupled with his criminal

---

[2]This amount was comprised of: (1) 869.3 grams of actual methamphetamine (17,386 kilograms of converted drug weight); (2) 30,883.0 grams of generic methamphetamine (61,766 kilograms of converted drug weight); and (3) 3,500 grams of fentanyl (8,750 kilograms of converted drug weight).  *See* Draft PSR at ¶ 40.

[3]This enhancement was based on Croskery's admission in the MOPA that he shot a person, identified by the initials A.P., in the ankle because he thought that A.P. stole methamphetamine from him.  Draft PSR at ¶ 43; MOPA at ¶ 8g.  After shooting A.P., Croskery threatened to shoot A.P. in the head should he ever steal from him again.  Draft PSR at ¶ 43.

history score of 6 (category III), resulted in a Sentencing Guidelines range of 360 months to life.  *Id.* at ¶¶ 50–52, 59, 83.

On November 9, 2023, the Government filed objections to the draft PSR, principally disputing Croskery's criminal history, as well as the total drug weight attributed to him.  Dkt. No. 83.  According to the Government, Croskery should have been held responsible for a total converted drug weight of 98,221.4 kilograms and received a criminal history score of 7.  *Id.* at 2–5.  As such, his total offense level should have been 43, and his criminal history category should have been IV, resulting in a Guidelines range of life.  *Id.* at 4–5.

That same day, Stamm also filed several objections to the draft PSR, including, most notably, to the application of the two-level enhancements for use of violence and aggravating role in the offense.  Dkt. No. 84 at 8–9.  Stamm argued that Croskery's adjusted offense level should be 37, which, when combined with his original criminal history category of III, would result in a 235 to 293-month Guidelines range.  *Id.* at 9–10.

On November 28, 2023, the USPO issued the final PSR, adopting certain objections from both sides,[4] and again finding Croskery's total offense level to be

---

[4]Specifically, although the PSR adopted the Government's objections as to drug quantity and criminal history, it also adopted Stamm's objection as to the enhancement for use of violence and subtracted a criminal history point from a different past offense because arrest reports were not received in time.  *See* PSR at 24–30.  These changes essentially cancelled out, and thus Croskery's offense level remained at 41, and his criminal history category at III.  *See id.* at 31.

41, his criminal history category to be III, and the applicable Guidelines range to be between 360 months and life.  PSR at ¶¶ 52, 59, 83, Dkt. No. 86.  The PSR nevertheless recommended that the Court vary downwards, and impose a sentence of 240 months as to Count 1 and 60 months as to Count 5, terms to run consecutively, for a total of 300 months.[5]  *See id.* at 31.

On December 4, 2023, Stamm filed a sentencing memorandum, requesting that the Court vary downward and impose a 240-month sentence in light of an apparent ambiguity in the MOPA as to the quantity of drugs Croskery admitted to trafficking, the PSR's improper application of the aggravating role enhancement, the criminal history score's "over-represent[ation] [of] the seriousness of Mr. Croskery's criminal history," the need to avoid unwarranted sentencing disparities between Croskery and his co-conspirators, the overly-long Guidelines ranges for Title 21 offenses, and Croskery's "extremely traumatic" childhood and adolescence.  Dkt. No. 87 at 12–26.  Two days later, the Government also filed a sentencing memorandum, refuting Croskery's arguments, highlighting aggravating factors, including Croskery's use of deception and violence, and requesting that the Court impose a sentence within "the advisory guidelines range of 360 months to

---

[5]By statute, any term imposed as to Count 5 (possession of a firearm in furtherance of a drug trafficking offense) must be at least five years and run consecutively to the sentence imposed for any other offense.  *See* 18 U.S.C. § 924(c)(1)(A)(i).

life (Count 1) followed by 60 months of incarceration (Count 5)[.]"  Dkt. No. 88 at 3–10.

On December 12, 2023, Croskery appeared for sentencing.  Dkt. No. 89. During that hearing, the Court gave Stamm an opportunity to argue her objections to the PSR, including, *inter alia*, with respect to the application of the two-level aggravating role enhancement, the criminal history score's purported overrepresentation of Croskery's true criminal history, and the total drug quantity for which Croskery was held responsible.  Tr. of Sentencing Hrg. at 3:3–10:11, Dkt. No. 102.  The Court then overruled the same, finding that the record provided more than sufficient support for the application of the two-level enhancement and the weighing of the criminal history score, and that there was no ambiguity in the MOPA which would support holding Croskery accountable for a lower quantity of drugs.  *Id.*

Consequently, the Court adopted the PSR without change, finding Croskery's total offense level to be 41, criminal history category to be III, and Guidelines range to be 360 months to life on Count 1, with a mandatory 60-month minimum consecutive term on Count 5.  *Id.* at 10:12–11:15.  After hearing sentencing recommendations from the parties, listening to Croskery's allocution, and considering the sentencing factors set forth in 18 U.S.C. § 3553(a), the Court varied downward and sentenced Croskery to 240 months on Count 1 and 60

months on Count 5, terms to run consecutively, for a total of 300 months.  *Id.* at

12:9–44:1.

## V.   <u>Appeal</u>

On December 13, 2023, the Court entered judgment as to Croskery.  Dkt.

No. 90.  Although the Court reminded Croskery during sentencing that the entry of

judgment would trigger a fourteen-day window to appeal, *see* Sentencing Hrg. Tr.

at 44:25–45:24, no such appeal was ever filed.

## VI.   <u>Section 2255 Motion</u>

Just four months after sentencing, on April 25, 2024, Croskery, proceeding

*pro se*, filed the instant motion pursuant to Title 28 of the United States Code,

Section 2255, contending that Stamm rendered ineffective assistance of counsel

throughout her representation.  Dkt. No. 94.  The Government filed its brief in

opposition on June 27, 2024.  Dkt. No. 103.  On May 23, 2025, following nearly a

year of extensions and delays, *see, e.g.*, Dkt. Nos. 105, 107, 109, 115, Croskery

replied.  Dkt. No. 117.  This Order now follows.

## <u>STANDARD OF REVIEW</u>

Pursuant to Title 28 of the United States Code, Section 2255, "[a] prisoner in

custody under sentence of a court established by Act of Congress . . . may move

the court which imposed the sentence to vacate, set aside, or correct the sentence."

28 U.S.C. § 2255(a).  The sentencing court may grant such relief if it concludes

"that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack[.]"  *Id.*

## **DISCUSSION**

Croskery brings several claims of ineffective assistance of counsel, which principally fall into two categories—those arising out of the negotiation of the plea agreement and those directed at sentencing and appeal.[6]  Within the first category, Croskery claims that Stamm: (1) coerced him into signing the plea agreement; (2) never explained what he was pleading guilty to; and (3) did not review his sentencing exposure in light of the plea agreement.  *See* Dkt. No. 94 at 5–6.  With respect to the second category, Croskery alleges that Stamm: (1) failed to object to the imposition of a four-level enhancement for misrepresentation of fentanyl; (2) failed to object to the drug quantities that were attributed to him; (3) failed to object to the application of a two-level aggravating role enhancement; (4) failed to object to the purity level of the drugs; (5) failed to raise the purported coercion he experienced by DEA agents; and (6) failed to consult with him about and/or file a

---

[6]Because Croskery is *pro se*, the Court construes his filings liberally.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

timely notice of appeal. *See id*. at 2–4, 6–10.  The Court addresses each ground for relief in turn.[7]

## I.    <u>Ineffective Assistance of Counsel: Framework</u>

Because each of Croskery's claims is premised on Stamm's allegedly ineffective assistance of counsel, the Court begins with the legal framework for such claims.

The Sixth Amendment guarantees criminal defendants a right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 684–86 (1984).  To prevail on a claim of ineffective assistance of counsel, a defendant must establish that: (1) "counsel's representation fell below an objective standard of reasonableness;" and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694.  In other words, the defendant must show both that counsel's performance was deficient, *and* that the deficiency was prejudicial. *Id.* at 691–92. The Court has discretion over the sequence in which to conduct this inquiry and may decline to "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

---

[7]Croskery appears to concede nearly all of these grounds in his reply brief. *See* Dkt. No. 117 at 1 ("After reviewing [the Government's] response it does seem that my attorney did represent me in a good manor [sic] however my main objection to [the Government's] response is that during the duration of time that me and my attorney were going over my PSR I was never told that I had a 4 point enhancement for 'misrepresenting' fetnaly [sic].").  Nevertheless, out of an abundance of caution, the Court elects to address each of Croskery's original arguments.

When evaluating deficiency, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689.  Accordingly, although the Court must:

> determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance . . . the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

*Id.* at 690.  "[C]onclusory allegations unsupported by specifics [are] subject to summary dismissal, as are contentions that in the face of the record are wholly incredible." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).

## II.    Plea Agreement

Croskery's first claims that Stamm was constitutionally ineffective in various ways throughout the plea-bargaining process.  *See* Dkt. No. 94 at 5–6; *Lafler v. Cooper*, 566 U.S. 156, 162 (2012) ("During plea negotiations defendants are entitled to the effective assistance of competent counsel." (quotation marks and citation omitted)).  When considering such claims, the "two-part *Strickland v. Washington* test applies[.]" *Hill v. Lockhart*, 474 U.S. 52, 58 (1985).  Specifically, while:

> [i]n the context of guilty pleas, the first half of the *Strickland v. Washington* test is nothing more than a restatement of the standard of attorney competence . . . [t]he second, or 'prejudice,' requirement . . . focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process.  In other words, in order to satisfy the 'prejudice' requirement, the defendant must show that there

is a reasonable probability that, but for counsel's errors, he would not
have pleaded guilty and would have insisted on going to trial.

*Id.* at 58–59.  In undertaking this evaluation and "determining whether a plea was
voluntarily and knowingly made, a defendant's plea colloquy is given great
weight." *Aruda v. United States*, 2017 WL 1737719, at *4 (D. Haw. May 3, 2017)
(quotation marks, brackets, and citations omitted); *accord Muth v. Fondren*, 676
F.3d 815, 821–22 (9th Cir. 2012) (collecting cases).

  **a.** **<u>Ground 1: Pressure to Involuntarily Plea</u>**

  Croskery first contends that Stamm was ineffective because she pressured
him into pleading guilty against his will.  *See* Dkt. No. 94 at 5–6.  According to
Croskery:

> Stamm took the position from the very start of her representation that I
> should not fight against the government and that it would be better if I
> would plead guilty to the charges against me . . . because the jury would
> find me guilty, and the result would be a much longer sentence.

*Id.* at 5.  As such, he "was presented with a plea agreement and was made to feel
that [he] had no choice but to sign it because the alternative was far more horrible."
*Id.*  Croskery suggests that had he not faced such "inescapable pressure to sign the
agreement. . . [he] would not have signed it."  *Id.*

  These allegations, however, lack credibility in light of the record as a whole.
Notably, review of Stamm's declaration and contemporaneous emails reveals that

she exerted *no* pressure—inescapable or otherwise—on Croskery to plead.[8]

Rather, Stamm simply *informed* him of his possible sentencing exposure should he

go to trial and the potential benefits and drawbacks of pleading.  *See* Dkt. No. 103-

3 at 45–46, 48 (explaining that "[t]he benefit of this bargain lies initially in the

avoidance of all the mandatory minimums that would apply if you were convicted

of all counts following a trial"); Stamm Decl. at ¶ 12 ("I [] explained that in my

view the plea agreement was far from ideal, but that given the strength of the

government's evidence, it would likely yield a better end result than would likely

be obtained following a trial.").  The ultimate choice of whether to accept that plea

agreement or go to trial was left solely up to Croskery.  *See* Dkt. No. 103-3 at 46

(telling Croskery that his "current choices are to pursue an agreement with the

terms outlined above or to proceed to trial" and that he would "need to select one

of these two choices" on her next visit); Stamm Decl. at ¶ 16 ("I never pressured

Mr. Croskery to plead guilty . . . [t]o the contrary, I told him directly that the

decision whether to plead guilty was his and his alone.").  Indeed, Croskery

confirmed the *same* during his plea hearing.  *See* COP Hrg. Tr. at 6:11–17

(attesting that no one threatened, forced, or coerced him into pleading guilty); *see

also Muth*, 676 F.3d at 821 ("Petitioner's statements at the plea colloquy carry a

---

[8]In fact, Croskery is the one who directed Stamm to begin negotiating a plea agreement on his behalf.  *See* Stamm Decl. at ¶ 10; Dkt. No. 103-3 at 37.

strong presumption of truth"); *Kingsbury v. United States*, 783 F.App'x 680, 682–

83 (9th Cir. 2019) (affirming the denial of an ineffective assistance of counsel

claim where the defendant's allegations that counsel pressured him to plead guilty

were contradicted by his statements during the plea colloquy that he had not been

threatened or coerced into entering the plea).  As such, the Court does not find that

Stamm rendered ineffective assistance by forcing Croskery to involuntarily plead

guilty to the charges against him.

> **b.**    **Ground 2: Failure to Explain the Plea Agreement**

In addition to allegedly pressuring him to plead guilty, Croskery claims that

Stamm was ineffective because she failed to explain precisely what the plea

agreement entailed.  *See* Dkt. No. 94 at 5–6.  Croskery contends that although

"[o]ne of the most important duties of an attorney representing a criminal

defendant is advising the defendant about whether he should plead guilty," Stamm

failed to "mak[e] sure [he] fully underst[ood] the contents of the . . . plea

agreement" because she never "reviewed, discussed, or explained [it] to [him]."

*Id*.  Croskery argues that "[h]ad [he] been aware of the contents of the agreement

and the potential negative impact that it would have on [him], [he] would not have

signed it."  *Id.* at 5.

Once again, however, the record reveals something very different.  Contrary

to Croskery's representations, Stamm's records indicate that she frequently

emailed him to discuss ongoing negotiations over the terms of a potential plea agreement, sent him a draft of the Government's proposed plea agreement, sat down with him to mark up and review the agreement "in detail . . . from beginning to end," and answered all of his questions regarding the same. *See* Stamm Decl. at ¶¶ 10–15; *see also* Dkt. No. 103-3 at 45–46 (email explaining that the Government was not amenable to a Rule 11(c)(1)(C) agreement and describing the terms of the Government's alternative proposal); *ibid.* at 48 (email reiterating the terms of the proposed plea agreement and its potential benefits); *ibid.* at 50–70 (marked-up copy of the MOPA). In fact, Croskery, once again, acknowledged the same under oath at the change of plea hearing. *See* COP Hrg. Tr. at 9:19–10:6, 21:19 (attesting that he had read and discussed the plea agreement with counsel, and was thus "confident [he] underst[ood] the terms of [his] plea agreement with the U.S. Attorney's Office[.]"). As such, Croskery cannot credibly argue now, in light of these sworn statements and supporting evidence, that Stamm failed to explain the MOPA or that he was ignorant as to its provisions at the time he entered his plea.

Moreover, even if the Court was willing to assume that Stamm had somehow abdicated her responsibility to explain the provisions of the plea agreement, the *Court* certainly made no such error. During Croskery's change of plea hearing, in addition to confirming that Croskery had read, reviewed, understood, and discussed the plea agreement with counsel, the Court also

independently went through the terms of the agreement on the record, ensuring that Croskery was apprised of all of its material provisions. *See id.* at 11:7–19:21. As a result, given that Croskery was clearly aware, by the time he entered his plea, of the "details of the plea content," Dkt. No. 94 at 5, he has failed to establish any prejudice resulting from Stamm's alleged deficiency. This claim fails to meet either of *Strickland*'s two prongs and is consequently denied.

### c.  Ground 3: Failure to Explain Effects of Plea Agreement on Sentencing Exposure

Next, Croskery attacks his plea agreement with respect to his sentencing exposure, arguing that Stamm was ineffective because she failed to "explain the details of what [his] sentence would be or how all the charges and the PSR drove the sentence calculation[.]" Dkt. No. 94 at 5. Croskery claims that due to this deficiency, he was unaware of his "exposure under the sentencing guidelines" and "the magnitude of sentence that [he] would face upon signing the plea agreement." *Id.* at 5–6. Had he known of these "potential negative impact[s] . . . [he] would not have signed it." *Id.* at 5.

This claim fares no better than the others. As an initial matter, Stamm once again flatly denies Croskery's allegations, attesting that "[f]rom the very outset of [her] representation of Mr. Croskery, [she] communicated to him very clearly and directly that he was facing a very long term of imprisonment" with or without the plea agreement. *See* Stamm Decl. at ¶¶ 6–15. These representations are consistent

with Stamm's contemporaneous notes and emails, which informed Croskery from the start that he was "in a very bad spot"—one in which he was facing a sentence of at least 25 years and potentially up to life. *See id.* at ¶¶ 7, 9, 11, 14; Dkt. No. 103-3 at 29, 35, 41–42. Stamm's records further indicate that she explained to Croskery that even if he were to accept the plea agreement that the Government offered, the Court could still impose a sentence up to and including life, but that doing so would permit him to argue for a mandatory minimum term of 15 years, rather than the minimum of 25 years that he would face if convicted at trial. *See* Stamm Decl. at ¶¶ 12–15; Dkt. No. 103-3 at 45–46, 48, 52–53, 66. Given the abundance of evidence indicating that Stamm advised Croskery, over and over again, as to the potential sentencing exposure he faced—both following trial and should he take the plea agreement—this argument simply fails.[9]

Moreover, even were the Court to suspend disbelief and assume, contrary to the evidence, that Stamm failed to explain Croskery's potential sentencing exposure, Croskery cannot show that any prejudice resulted from the same. Notably, in addition to anything that Stamm might have done, the *Court* also explained the potential sentencing consequences of Croskery's plea at his change

---

[9] Indeed, Croskery *admits* elsewhere in his motion that Stamm "explained that my sentencing guideline point total was 44, which put me into the category of 360 months to life. However, if I accepted a plea, a three-point reduction on the scale (for cooperating with the plea) would bring me down to 41 total points and she would then argue for a 20-year sentence." Dkt. No. 94 at 2.

of plea hearing, asking:

> THE COURT:     [AUSA] Akina, what are the potential penalties that Mr. Croskery faces for pleading guilty as to each of Counts 1 and 5?
>
> MR. AKINA:     As to Count 1, the defendant faces a term of imprisonment of not less than ten years, up to life, and a fine of up to $10 million, plus a term of supervised release of not less than five years and up to life.
>
> As to Count 5, the defendant faces a term of imprisonment of not less than five years and up to life, which must be served consecutively to any other sentence imposed, and a fine of up to $250,000, plus a term of supervised release up to five years.
>
> . . .
>
> THE COURT:     Mr. Croskery, do you, sir, understand the potential penalties that you face for pleading guilty to each of these two counts, including the mandatory minimum terms of imprisonment and supervised release that might apply?
>
> [CROSKERY]:    Yes, sir, I do.

COP Hrg. Tr. at 8:13–9:18.  As such, insofar as Stamm was allegedly deficient by failing to inform Croskery of his sentencing exposure, that deficiency was remedied by the Court *prior* to Croskery pleading guilty and thus, no prejudice could have resulted.  This claim of ineffective assistance of counsel is therefore denied.

## III.    Sentencing/Appeal

In addition to her alleged deficiencies during the plea process, Croskery also asserts that Stamm was ineffective with respect to sentencing and appeal, including by failing to: (1) object to the application of a four-level enhancement for misrepresenting fentanyl as oxycodone; (2) challenge the drug quantities attributed to him; (3) object to the application of a two-level aggravating role enhancement; (4) contest the disparate treatment of the actual versus generic methamphetamine; (5) raise the alleged coercion he experienced by DEA agents; and (6) advise him of his right to appeal and/or file a timely notice of appeal.

### a.    Ground 4: Failure to Object to Enhancement for Misrepresentation of Fentanyl

Croskery first argues that Stamm was ineffective during sentencing because she failed to object to the imposition of a four-level enhancement under USSG § 2D1.1(b)(13) for "knowingly misrepresent[ing] or knowingly market[ing] as a another substance a mixture or substance containing fentanyl[.]"[10]  *See* Dkt. No. 94

---

[10]In his reply brief, Croskery takes a slightly different tack to this argument, asserting that:

> during the duration of time that me and my attorney were going over my PSR I was never told that I had a 4 point enhancement for 'misrepresenting' fetnaly [sic].  I simply was told that I was being enhanced for fetnaly [sic].  If this would have been explained to me I would have objected to this part of my PSR.  In turn I would be sentenced with 4 less points bringing me down to a level 37.  That being the case I would have gotten a much lesser sentence.

Dkt. No. 117 at 1.  This allegation, however, is directly contradicted by Stamm's sworn statement that "Mr. Croskery and I specifically discussed the possibility of a four-level increase

at 2–3; USSG § 2D1.1(b)(13).  According to Croskery, "[t]hroughout this process, the prosecution held a position against [him] for contributing to society's drug problem by falsely promoting the product [he] was selling as Oxycodone (instead of Fentanyl)."  *Id.* at 2–3.  However, "[t]his accusation was absolutely false" as "[t]here is indisputable evidence available through those who purchased the pills that the buyers clearly knew that they were purchasing fentanyl and not oxycodone."  *Id.* at 3.  Stamm nevertheless "chose to disregard this important part of [his] defense rather than fight on [his] behalf."  *Id.*  Croskery claims that "[h]ad counsel fought to fight the misrepresentation issue, . . . [his] point total would have been reduced to 37, resulting in a much lower sentence."  *Id.*

Croskery fails, however, to show that Stamm's decision not to contest the application of this enhancement fell below a reasonable standard of professional assistance.  As an initial matter, although Croskery argues that "all the people" he sold pills to "clearly knew" that they were buying fentanyl, rather than oxycodone, he never *identifies*—either in his original Section 2255 motion or in his reply brief—who these buyers might have been.[11]  *See* Dkt. No. 94 at 2–3; Dkt. No. 117

---

in base offense level based on [the misrepresentation of fentanyl] prior to his plea" and "the[] reasons we would not be able to effectively dispute this adjustment in either the objections to the draft presentence report or in the defense sentencing memorandum."  Stamm Decl. at ¶ 25.  Even if Stamm had failed to do so, no prejudice could have resulted for the reasons discussed *infra* 21–23.

[11]In his reply brief, Croskery contends that had the Court given him the cellphone extractions that he requested, *see* Dkt. Nos. 113 & 114, he would have been able to "prove through text messages that this is true."  Dkt. No. 117 at 1.  This unsupported argument, however, holds little

at 1.  In fact, contrary to Croskery's representations, the only two buyers identified in the record—Daniel Hartner and Noah Stamm—explicitly indicated that they believed the pills to be oxycodone, and had no idea that what they received was, in fact, fentanyl.  *See* Stamm Decl. at ¶ 25; PSR at ¶¶ 17, 44; Dkt. No. 103-3 at 20. Their statements are consistent with the record generally, which indicates that Croskery "reportedly told agents he had been selling counterfeit Oxycodone," directed others, including Jeffrey Selner and Joey Nishimura, to procure and/or sell "oxycodone pills," and that "the pills distributed by Mr. Croskery appeared to be Oxycodone pills in color, shape, size, and markings."  *See* Stamm Decl. at ¶ 25; PSR at ¶¶ 17, 21–22, 44; Dkt. No. 103-3 at 20–22, 24.  In short, given the evidence supporting the application of this enhancement, the Court does not find that Stamm's decision not to object to the same fell outside of "the wide range of reasonable professional assistance . . . under the circumstances" or that, in any case, Croskery suffered prejudice from her refusal to do so.  *See Strickland*, 466 U.S. at 689, 699–700; *see also United States v. Ka'anoi*, 2024 WL 342859, at *16– 17 (D. Haw. Jan. 30, 2024) (finding no prejudice in an attorney's decision not to press an objection where the sentencing enhancement at issue was well-supported

---

weight in light of Croskery's failure to ever name these buyers or offer statements or declarations from such persons, as well as Stamm's testimony that "Mr. Croskery never directed me toward any evidence tending to demonstrate that he did not knowingly market fentanyl as Oxycodone." *See* Dkt. No. 113 at 1; Dkt. No. 117 at 1; Stamm Decl. at ¶ 25; *see also United States v. Finkel*, 165 F.App'x 531, 533 (9th Cir. 2006) ("[H]abeas petitioners may not use federal discovery for fishing expeditions to investigate mere speculation." (quotation marks and citation omitted)).

by the record, and there was no chance of a different outcome).  Croskery's claim of ineffective assistance of counsel is therefore denied in this regard.

**b.   Ground 5: Failure to Object to Drug Quantities Attributed to Croskery**

Croskery next claims that Stamm rendered ineffective assistance of counsel because rather than challenge the quantity of drugs attributed to him by the PSR, "she chose to simply accept the allegations of the prosecutor."[12]  Dkt. No. 94 at 5.  According to Croskery, such failure was "critical to [his] defense because without [such objections,] the prosecution's statements became the standard from which the sentence was rendered."  *Id.*  Croskery therefore argues that "there is a strong probability that if not for counsel's errors the proceedings would have been different."  *Id.* at 6.

This argument, however, falls flat in light of the record.  Notably, contrary to Croskery's assertions, Stamm actually objected twice, in writing, as to drug quantity, arguing that the plea agreement indicated that Croskery only took seven months' worth of trips to transport drugs, not eight, and thus should only be held accountable for the corresponding amount.  *See* Dkt. No. 84 at 6–7; Dkt. No. 87 at

---

[12]Notably, Croskery provides almost *no* supporting detail for this allegation, including with respect to the drug with which he takes issue (*i.e.*, actual methamphetamine, generic methamphetamine, or fentanyl), what he believes the proper quantity to have been, or why he believes the PSR's calculations to be incorrect.  *See* Dkt. No. 94 at 5.  Although this lack of specificity would itself be sufficient to deny this ground, *see Blackledge*, 431 U.S. at 74, in light of Croskery's *pro se* status, the Court nevertheless attempts to address it on the merits.

12–13.  She made a similar argument at sentencing, emphasizing that given the ambiguity in the plea agreement, Croskery should be granted the benefit of the doubt and held responsible for a lesser quantity.  *See* Sentencing Hrg. Tr. at 6:14–8:1.  As such, Croskery's claims that Stamm "never bothered to argue a single point in my favor and she specifically chose to not file any objections to the prosecutor's allegations," including with respect to "the amounts of drugs involved," are simply meritless.  Dkt. No. 94 at 5–6.

Moreover, to the extent that Croskery suggests that Stamm was somehow deficient in the *way* she argued this objection, he cannot show that any prejudice resulted from the same.  Notably, in overruling the objection, the Court explained:

> I see no ambiguity. . . . I'm looking at the plain language of the plea agreement, and when I do so, the period during June 2021 through February 3rd, 2022 is objectively an eight-month period.  I just don't see it any other way.  It's not seven months.  You can count June, June is inclusive, and when you do, June through January is a period of eight months.  The three days in February through February 3rd are not taken into account for this purpose.
>
> So the objection is overruled.  The calculation that is set forth in the PSR stands.

Sentencing Hrg. Tr. at 9:24–10:11.  Given this explanation, Croskery cannot credibly claim that different or more strenuous argument would have changed the Court's view of the plea agreement's "objective" language, and thus altered his outcome.  This claim for ineffective assistance of counsel is accordingly denied.

- 24 -

**c.    Ground 6: Failure to Object to Use of Relevant Conduct/Aggravating Role Enhancement**[13]

Croskery additionally argues that Stamm was deficient because she failed to object to the application of the two-level aggravating role enhancement pursuant to USSG § 3B1.1(c).  Dkt. No. 94 at 6–7.  Under that section, a sentencing court may consider "the defendant's role in the offense" and if it finds that "the defendant was an organizer, leader, manager, or supervisor in any criminal activity . . . increase [the offense level] by **2** levels."  USSG § 3B1.1(c).  Croskery, however, contends "[t]here was simply no evidence that [he] would have been found guilty of playing the role that [his] sentence was based on if the charges had been objected to and the actual facts were revealed."  Dkt. No. 94 at 7.  In fact, Croskery claims that "[he] had clearly expressed [his] objection to the role [he] was labeled with, but [Stamm] failed to act upon this issue" by "fil[ing] any written objection" or "mak[ing] any oral objections . . . before or at the sentencing hearing."  *Id.*

---

[13]Although this ground is technically titled as a claim that "My Counsel was Ineffective at Sentencing for failing to object to the use of the Relevant Conduct," review of the substance of Croskery's argument reveals that it is more properly treated as a claim that Stamm was ineffective for failing to object to the application of the two-level aggravating role enhancement that he received at sentencing.  *See* Dkt. No. 94 at 6–7.  To the extent that Croskery intends otherwise, it is entirely unclear what the objectionable "relevant conduct" would be, and, in any case, his plea agreement waived any objection to consideration of large swaths of the same.  *See* MOPA at ¶ 4.

Croskery thus maintains that "if not for the counsel's failure to object, the outcome at sentencing would have been different." *Id.*

Once again, however, Croskery's argument misses the mark. As an initial matter, he is simply factually inaccurate—Stamm actually filed *two* separate written objections to the application of the aggravating role enhancement and orally reiterated the same at sentencing. *See* Dkt. No. 84 at 9 (arguing that the evidence did not support that Croskery "play[ed] a particularly meaningful role" in the conspiracy); Dkt. No. 87 at 13–16 (stressing that there was no evidence that Croskery exerted the type of authority and control over others that is necessary to establish the enhancement); Sentencing Hrg. Tr. at 3:10–19 (standing on the objection). Any contentions to the contrary are therefore meritless.

Moreover, even if Stamm had failed to object or her objection was deficient in some way, Croskery fails to show that any prejudice resulted from the same. Notably, despite Croskery's claims that there was no evidence supporting his characterization as a manager, supervisor, leader, or organizer of the criminal conspiracy, the Court explained at sentencing that the record clearly demonstrated the opposite:

> The defendant organized the shipments and storage of drugs from California to a friend's residence here in Honolulu. He also stored drugs and firearms at the residence of another friend. Because these were his friends not that of his significant other at the time, the defendant would have had to set this arrangement up. That's enough to constitute an, quote, organizer, leader, manager or supervisor under

3B1.1, even without regard, as the PSR discusses, to defendant's relationship to related defendants Selner and Nishimura.

Sentencing Hrg. Tr. at 3:25–4:8; *accord* PSR at ¶ 46. Thus, in light of the evidence supporting the application of this enhancement, Croskery cannot show that—but for Stamm's alleged failures—the Court would not have applied the two-level increase under Section 3B1.1(c). The Court therefore does not find that Croskery was rendered ineffective assistance of counsel in this regard.

### d.    Ground 7: Failure to Object to Drug Purity

Croskery also contends that Stamm's representation was constitutionally deficient because she failed to challenge "the purity level of the drugs" for which he was held responsible. Dkt. No. 94 at 5. In the PSR, Croskery was held accountable for three different drug types/purities: (1) 869.3 grams of actual methamphetamine; (2) 35,419.0 grams of generic methamphetamine; (3) and 4,000.0 grams of fentanyl.[14] PSR at ¶ 40. To calculate his base offense level, the Sentencing Guidelines therefore required that each of these disparate substances be

---

[14]Actual methamphetamine refers to the "weight of the controlled substance, itself, contained in the mixture or substance" and is often used interchangeably with the term "ice," which refers to a "a mixture or substance containing [methamphetamine] of at least 80% purity." *See* USSG § 2D1.1 n.8(B)–(C). Generic methamphetamine, on the other hand, refers to "the entire weight of any mixture or substance containing a detectable amount of the controlled substance" and can be of any purity. *See* USSG § 2D1.1 n. 8(A). In general, the difference between these two simply comes down to whether the methamphetamine has been laboratory-tested. *See* PSR at ¶ 38; *see also United States v. Rodriguez*, 382 F.Supp.3d 982, 896 (D. Alaska 2019) (explaining that while "[u]nder the current guidelines range, the presumed purity of untested methamphetamine is 10 percent…average nationwide purity rates…ha[ve] continued to rise…reaching about 93 percent in 2012.").

converted into a standardized drug weight, aggregated, and compared to the Drug Quantity Table. *See id.*; USSG § 2D1.1 cmt. 8(B). In doing so, the PSR applied a 10-to-1 conversion rate disparity between actual and generic methamphetamine pursuant to USSG § 2D1.1 cmt. 8(D).[15] Croskery, however, now claims that Stamm should have disputed this conversion rate disparity as "[t]here is established precedent within the federal court system that . . . . a district court may . . . vary from the Sentencing Guidelines for methamphetamine as the result of a policy disagreement."[16] *See* Dkt. No. 94 at 3; *see, e.g.*, *Rodriguez*, 382 F.Supp.3d at 893, 895 (granting routine downward variances on the grounds that "the Guideline's distinction between pure or 'actual' methamphetamine and less pure mixtures when determining a base offense level . . . does not comport with the reality of how methamphetamine is created, trafficked, and sold today, and creates an arbitrary distinction between defendants that runs contrary to the § 3553(a) factors"); *United States v. Carrillo*, 440 F.Supp.3d 1148, 1151–53 (E.D. Cal. 2020)

---

[15]Put differently, under the Sentencing Guidelines, "10 grams of [actual] methamphetamine is treated the same as 100 grams of [generic] methamphetamine [] for calculating a defendant's Guidelines sentencing range." *Rodriguez*, 382 F.Supp.3d at 894.

[16]The Government construes this argument somewhat differently, suggesting that Croskery claims that Stamm was ineffective because she failed to challenge the purity determination with respect to the 35,419 grams of unseized methamphetamine for which he was held responsible, as opposed to the 869.3 grams of actual methamphetamine which the Government seized and tested. *See* Dkt. No. 103 at 28–30. The Court does not read Croskery's motion that way. *See* Stamm Decl. at ¶¶ 22–23. Nevertheless, even if that is, in fact, what Croskery claims, it would likewise be unavailing as Croskery already received the benefit of having the untested 35,419 grams of methamphetamine count as generic methamphetamine and converted at the lower rate. *See* PSR at ¶¶ 38, 40.

(collecting cases).  Because Stamm "chose to not argue this point,"[17] Croskery

claims that he was denied a "downward departure[] of approximately one-third of

what the sentencing scale called for."[18]  Dkt. No. 94 at 3.

This argument is also meritless, as even if the Court were to assume that

Stamm was somehow deficient by failing to raise an objection to the PSR's

disparate treatment of actual versus generic methamphetamine, Croskery cannot

show that her omission was prejudicial in any way.  Notably, although district

courts certainly have the "authority to vary from the [methamphetamine]

Guidelines based on a policy disagreement with them," they are never *required* to

do so.  *See Spears v. United States*, 555 U.S. 261, 264 (2009) (emphasis omitted);

*United States v. Mitchell*, 624 F.3d 1023, 1030 (9th Cir. 2010).  Indeed, this Court

has *never* done so, and would not have in this case, particularly given that

---

[17]According to Croskery, Stamm actually "did bring the purity issue to the attention of the judge at sentencing, but the judge summarily dismissed the idea." Dkt. No. 94 at 3.  This assertion, however, is contradicted by the record which indicates that the only discussion of drug purity at sentencing came in the context of the *Government*'s suggestion that Croskery should be held accountable for a higher drug *quantity* given the PSR's determination that the 35,419 grams of untested methamphetamine should be treated as generic.  *See* Sentencing Hrg. Tr. at 8:17–9:16.
[18]It is somewhat unclear where Croskery got these numbers.  Had the Court treated the 869.3 grams of actual methamphetamine as generic methamphetamine, it would have converted it to 1,738.6 kilograms of standardized drug weight.  *See* USSG § 2D1.1 cmt. 8(D).  This would have then been added to the converted generic methamphetamine and fentanyl weights to reach a total converted drug weight of 82,576.6 kilograms and a base offense level of 36.  *See* PSR at ¶ 40; USSG § 2D1.1(c).  Following adjustment for various enhancements and acceptance of responsibility, Croskery's total offense level would have been 39 which, when combined with his criminal history category of III, would have resulted in an amended Guidelines range of 324 to 405 months—nowhere near the one-third departure that Croskery claims entitlement to.  *See* PSR at ¶¶ 41–52, 59; USSG ch. 5 pt. A.

- 29 -

Croskery's *only* argument for a downward variance is that other district court judges have varied on such grounds.  *See* Dkt. No. 94 at 3; *see also United States v. Heim*, 941 F.3d 338, 340–41 (8th Cir. 2019) (declining to compel the district court to vary from the methamphetamine Guidelines simply because other judges within the district had done so based on policy disagreement).  In other words, the *existing* Sentencing Guidelines are what this Court considers—not speculation or arguments as to what the Guidelines *should* be.[19]  *See United States v. Henderson*, 649 F.3d 955, 964 (9th Cir. 2011) ("[D]istrict courts are not obligated to vary from the . . . Guidelines on policy grounds if they do not have, in fact, a policy disagreement with them"); *United States v. Gonzales*, 2025 WL 1949731, at *2 (9th Cir. 2025) ("Given that a court may deviate from the Guidelines based on policy considerations, it naturally follows that a court may decline to deviate from the Guidelines based on those same considerations.").  This claim of ineffective assistance of counsel is therefore denied.

---

[19]In fact, as Stamm suggests, raising such an objection could have had deleterious consequences by drawing attention to the fact that although:

> Mr. Croskery told agents that he obtained roughly seventy-eight additional pounds of methamphetamine[] from the exact same suppliers of the highly pure methamphetamine that was seized[,] Probation applied the actual calculation for especially pure methamphetamine only to the seized two pounds and not to the other seventy-eight pounds which were never seized and as a result could not be tested.

Stamm Decl. at ¶ 23.

    e.    **Ground 8: Failure to Challenge Coercion by DEA Agents**

Beyond specific objections associated with the PSR, Croskery also contends that Stamm was ineffective during sentencing because she "fail[ed] to challenge…the promise from the DEA agents of a lesser sentence based on the initial information, and advice that [he] voluntarily provided."  Dkt. No. 94 at 5.  Croskery alleges that following his arrest, "[DEA] agents proceeded to interrogate [him] and coerce[] [him] into cooperating by stating that [he] would be sentenced to less time for the crimes and [his girlfriend] would be kept free of any charges."  *Id.* at 2.  Based on these representations, Croskery described his drug trafficking operation in detail to the agents, including the location of where he stored the drugs.  *Id.*  The agents later went to that location, where they recovered additional methamphetamine, fentanyl, and firearms.  *Id.*  Croskery was then indicted on the original charges in the criminal Complaint, "as well as five additional charges based on the items the agents recovered at [the location Croskery gave them]," thereby "placing [him] in a sentence range of 30 years or more" based on his own cooperation.  *Id.*  As such, Croskery claims that Stamm was ineffective because "had counsel argued this point, the potential for a further point reduction existed."  *Id.* at 3.

This argument, like the others, lacks merit.  Notably, prior to Stamm's entry into the case, Rodby had already raised this argument on a motion to suppress,

claiming that "law enforcement led Defendant to believe that waiving his constitutional right to remain silent and cooperating with law enforcement's investigation would lessen his final sentence and spare his girl friend from prosecution."  Dkt. No. 26 at 10.  The Court, however, *rejected* this argument, following an evidentiary hearing, noting that Croskery's assertions were explicitly refuted by the DEA agent's credible testimony that although he informed Croskery that "prosecutors sometimes offer leniency to criminal defendants who cooperate with law enforcement[,]" he also told him "that agents are not permitted to and do not make promises of leniency because that is the prerogative of prosecutors and the court."[20]  *See* Dkt. No. 54 at 11; *see also* COP Hrg. Tr. at 24:22–24 (confirming that no one had made any promises to him regarding the sentence he would receive).   As such, in light of these findings, there is no way that Croskery can credibly argue that Stamm's refusal to further contest the DEA agents' alleged misconduct was deficient or that had she done so, it would have led to a different outcome with respect to sentencing.  Croskery's claim of ineffective assistance of counsel is therefore denied in this regard.[21]

---

[20]Of course, any such promises would also be inconsequential given that, as the Court informed Croskery, "the Court is not bound . . . by any recommendations provided to it by counsel, by probation or by anyone else, and [] could impose a sentence that is more severe than what you expect up to the maximum permitted by law."  COP Hrg. Tr. at 24:14–19; *accord* Stamm Decl. at ¶ 9 (testifying that she never "assure[d] Mr. Croskery that the Court would follow any particular terms of any agreement at sentencing.").

[21]It is also notable that while Croskery contends he was promised a "lesser sentence" if he cooperated, *see* Dkt. No. 94 at 5, he received a sentence that was significantly below the low end

### f.   Ground 9: Failure to Advise of Right to Appeal

Finally, Croskery argues that Stamm was ineffective because she "failed to advise [him] of [his] appeal rights or to file a notice of appeal on [his] behalf." Dkt. No. 94 at 10.  According to Croskery, although Stamm was "an experienced attorney [and] should have recognized that [he] had a nonfrivolous ground to appeal," she never "bothered to adequately consult with [him] after sentencing" or inform him of the "right to appeal, . . . the procedure and time limits involved and [] the right to appointed counsel on appeal." *Id.* at 9.  Had she done so, Croskery claims that "Stamm would have known that [he] desired to appeal." *Id.*  As a result, Croskery suggests that he was wrongfully "deprived [] of an appeal [he] otherwise would have taken." *Id.*

As with other claims of ineffective assistance of counsel, claims for failure to appeal are governed by the two-prong *Strickland* standard.  *See Roe v. Flores-Ortega*, 528 U.S. 470, 476–77 (2000).  The Court must determine: "(1) [] whether counsel consulted with the defendant about an appeal; [and] (2) if not, was [the] failure to consult deficient performance."[22]  *United States v. Sandoval-Lopez*, 409

---

of the Guidelines range.  *Compare* Sentencing Hrg. Tr. at 11:9–15 (finding the applicable Guidelines range to be between 360 months to life on Count 1 with a mandatory 60-month minimum consecutive term on Count 5), *with ibid.* at 40:17–25 (imposing a term of 240 months on Count 1 and 60 months on Count 5, terms to run consecutively, for a total of 300 months).
[22]In the context of an ineffective assistance of counsel claim, "consultation" requires the attorney to not only have a conversation with the defendant about appeal, but to "advise[] the defendant about the advantages and disadvantages of taking an appeal, and mak[e] a reasonable effort to discover the defendant's wishes." *Flores-Ortega*, 528 U.S. at 478.

F.3d 1193, 1195–96 (9th Cir. 2005). In general, an attorney's failure to consult a defendant regarding appeal will be considered constitutionally deficient "when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." *Flores-Ortega*, 528 U.S. at 480. In conducting this inquiry, the Court must "take into account all the information counsel knew or should have known," and consider "highly relevant factor[s]" including "whether the conviction follow[ed] a trial or a guilty plea," and if there was a plea, whether "the defendant received the sentence bargained for as part of the plea and whether the plea expressly reserved or waived some or all appeal rights." *Id.* If the Court finds that the attorney's failure to consult constituted deficient performance, the defendant must then also demonstrate prejudice by showing "that there is a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed." *Id.* at 484.

Here, as an initial matter, Stamm flatly refutes Croskery's suggestion that she did not consult with him regarding his right to appeal, the timing of the same, or the availability of appointed counsel. *See* Stamm Decl. at ¶¶ 28–29 ("[O]n December 12, 2023, (the day of Mr. Croskery's sentencing) during an in-person meeting . . . I reiterated to Mr. Croskery that he had waived his right to appeal

anything other than an above-guidelines range sentence (as calculated by the Court, not by the defense) or a conviction or sentence marred by ineffective assistance of counsel" and "informed Mr. Croskery about the time limit for a notice of appeal and urged him to get in touch with me right away following sentencing if he developed any additional questions or concerns about his sentence, an appeal, or the appeal waiver."). But even if she failed to do so, Croskery cannot show that her lack of consultation was constitutionally deficient given that he never demonstrated any interest in appealing and there was no rational reason to presume, absent some affirmative indication, that he would have wanted to do so. Certainly, even though Croskery was made aware of his various appellate rights and timing by the Court at sentencing, *see* Sentencing Hrg. Tr. at 44:25–45:24, he does not claim—even now—that he ever contemporaneously indicated his desire to appeal his conviction or sentence to anyone. *See* Dkt. No. 94 at 9 (suggesting that "Stamm, as an experienced attorney, *should have recognized* that [he] had a nonfrivolous ground to appeal"[23] and "[h]ad Stamm bothered to adequately consult with [him] after sentencing . . . [she] *would have known* I desired to appeal" (emphases added)). Nor, in any case, is there reason to believe that a rational defendant would have wanted to appeal given that Croskery pled guilty, received a

---

[23]Of course, Croskery never mentions precisely what this non-frivolous ground for appeal might have been. *See generally* Dkt. No. 94 at 7–10.

sentence well below the applicable Guidelines range,[24] and was subject to an

appellate waiver provision[25] which, in light of his below-Guidelines sentence,

barred him from raising any claim other than ineffective assistance of counsel.[26]

*See* MOPA at ¶ 13; *see also* Stamm Decl. at ¶ 27 ("I was not at the time of Mr.

Croskery's sentencing and am not now aware of any nonfrivolous ground to appeal

given Mr. Croskery's plea, his plea agreement, the Court's below-Guidelines

sentence, and the appeal waiver herein"); *Flores-Ortega*, 528 U.S. at 480

(identifying guilty pleas, appellate waivers, and the receipt of a bargained-for

sentence as factors which "may indicate that the defendant seeks an end to judicial

proceedings.").  Consequently, assuming that Stamm, in fact, failed to consult with

Croskery regarding appeal, the Court does not find that "as a *constitutional* matter"

---

[24]Moreover, as the Court noted at sentencing, Croskery was fortunate to receive such a large variance given that "there's very little here to go on in terms of why the Court would downwardly vary . . . and not just downwardly vary[], but . . . downwardly vary[] a significant amount below the 360-month low end of the guideline range."  *See* Sentencing Hrg. Tr. at 44:2–8.

[25]Croskery now attempts to disavow this clause, claiming that "the plea agreement contained no such appeal waiver provision that [he] was aware of."  Dkt. No. 94 at 9.  This assertion, however, is entirely meritless given that both Stamm and the Court extensively reviewed the appellate waiver with Croskery at the time of his plea.  *See* Stamm Decl. at ¶¶ 14, 26; Dkt. No. 103-3 at 58–59; COP Hrg. Tr. at 12:12–13:4, 14:15–21, 15:4–16:21.

[26]Given this provision, there is also no prejudice from Stamm's alleged failure to appeal as "[c]laims of ineffective assistance of counsel are generally inappropriate on direct appeal" and would have to be raised, as happened regardless, on collateral attack.  *United States v. McKenna*, 327 F.3d 830, 845 (9th Cir. 2003).

her decision was "necessarily unreasonable, and therefore deficient." *Flores-Ortega*, 528 U.S. at 479.  This claim of ineffective assistance of counsel is therefore also denied.

## IV.   **Evidentiary Hearing**

Although it is unclear whether Croskery requests an evidentiary hearing on his various claims for relief, the Court must hold such a hearing, pursuant to 28 U.S.C. § 2255(b), "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief[.]"

Here, as detailed above, the record conclusively demonstrates that Croskery is not entitled to relief based on the claims of ineffective assistance of counsel raised in his Section 2255 motion.  The Court therefore finds no evidentiary hearing is necessary or warranted.

## V.   **Certificate of Appealability**

Finally, in denying Croskery's Section 2255 Motion, the Court must address whether he is entitled to a Certificate of Appealability ("COA").  *See* R. 11(a), Rules Governing Section 2255 Proceedings.  The Court may only issue a COA where "the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To do so, the applicant must show that "reasonable jurists could debate whether (or, for that matter agree that) the petition should have been resolved in a different manner or that the issues

presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quotation marks and citation omitted).

Here, in light of the analysis and findings above, the Court finds that reasonable jurists would not debate the resolution of Croskery's claims. Accordingly, the Court declines to issue a COA.

## CONCLUSION

For the reasons set forth herein, Petitioner Cyrus Croskery's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, Dkt. No 94, is DENIED without an evidentiary hearing. In addition, the Court DENIES a Certificate of Appealability.

The Clerk of Court is instructed to enter Judgment in favor of Respondent, United States of America, and then to CLOSE Case No. 24-cv-00189-DKW-KJM.

IT IS SO ORDERED.

DATED: August 19, 2025 at Honolulu, Hawai'i.



Derrick K. Watson
Chief United States District Judge

---

United States of America vs. Cyrus Croskery; Cr. 22-00059 DKW; Civ. 24-00189 DKW-KJM; **ORDER (1) DENYING MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY; (2) DENYING EVIDENTIARY HEARING; AND (3) DENYING CERTIFICATE OF APPEALABILITY**